UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE GREAT BRITISH TEDDY BEAR CO.<br><br>                    Plaintiff,<br><br>          v.<br><br>McNEIL-PPC, INC and VIDAL PARTNERSHIP, INC,<br><br>                    Defendants. | 12 Civ. 3926<br><br>**OPINION** |

      Plaintiff The Great British Teddy Bear Company Limited brings this action against defendants McNeil-PPC Inc. ("McNeil") and the Vidal Partnership, Inc. ("Vidal"). Plaintiff alleges three causes of action sounding in federal copyright and trademark law, as well as New York state consumer protection law.

      Defendants now move to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. The motion is granted.

## The Complaint

      Plaintiff is a British corporation whose primary business is the manufacture and distribution of a line of teddy bears dressed as notable British figures. One of these teddy bears wears the characteristic kelly green outfit of Robin Hood and carries a bow and an arrow tipped with a suction cup. Plaintiff alleges that this and every bear it produces is

1

copyrighted under British law.

Defendant Vidal, a New York company, specializes in advertising directed at Spanish-speaking markets. McNeil, a New Jersey pharmaceutical company, hired Vidal to produce an online advertising campaign for its antihistamine Zyrtec. Vidal developed a concept in which cherished objects were revealed to be the cause of allergies. The upshot was that Zyrtec would allow the allergy sufferer to enjoy the objects again.

Vidal soon identified plaintiff's Robin Hood bear as an item that could be used in the Zyrtec campaign. In January 2012, Vidal business manager Michelle Sullivan-Brady contacted plaintiff's managing director Paul Jessup about the Robin Hood bear. Both the claims and the defenses in this case arise from the subsequent email exchange between Sullivan-Brady and Jessup which is described below.[1]

The first email arose as follows. On January 18, 2012, Jessup received notice from a retailer that Vidal was interested in licensing its bear. Jessup then contacted Sullivan-Brady, who had reached out to the retailer:

> We would be delighted to discuss the use of our Teddy Bear in one of your ads, we are committed to enhancing our brand and believe that building partnerships with others that echo our core values, will introduce our bears to a wider audience. If you could let me know who your audience [is] I am sure we will be able to work together.

On January 20, Sullivan-Brady emailed Jessup to begin negotiating in earnest:

> We were hoping to use your Robin Hood Teddy Bear in one of our internet ads for a Pharmaceutical client of ours.  I can't tell you the name of the client yet, for confidentiality reasons, but I can tell you that the

---

[1] It is evident from both the complaint and plaintiff's brief in opposition that plaintiff had "actual notice of all the information" in these emails and "relied upon [them] in framing the complaint," so the court may consider them without converting the instant motion to dismiss into a motion for summary judgment. <u>Cortec Industries, Inc. v. Sum Holding L.P.</u>, 949 F.2d 42, 48 (2d Cir. N.Y. 1991).

2

concept of the ad is for the bear to be portrayed as one of the things in your everyday life which you love, but which could be triggering allergic symptoms. FYI, other versions of the ad feature a kitten and flowers.

If you are OK with the basic concept and think we could move forward with this, please let me know what next steps would be, so I can tell my team if they should proceed with the concept or not. I will be able to share more details with you when things are more finalized.

On January 23, Jessup replied with some general concerns and questions about the campaign:

1. Why our Robin Hood Teddy Bear, rather than a generic teddy bear
2. Where will the ad be shown
3. How many people do you expect to see the ad

My initial reservation is likely to be shared by any soft toy manufacturer......

Our Bears are made from a hypoallergenic plush and stuffed with a hypoallergenic stuffing in accordance with ASTMF & CSPIA Federal toy safety regulations making our toy <u>less likely</u> to trigger allergic reactions.

http://www.professional-laboratory.com/product_61.html

I would not want our brand to be misrepresented as "triggering allergic symptoms"

However I am excited about our brand being something loved.

The next day, Sullivan-Brady replied to assuage Jessup's concerns about the advertisement:

1. We'd like to use your Robin Hood Teddy Bear in particular because part of the concept involves the arrows that the bear carries.
2. The ad will be used online only, no TV.
3. Per our media dept. the total impressions will be 194 million.

I appreciate your concern about having your bear being linked in people's minds with allergic reactions, however the voice over dialogue specifies that the allergic reactions are caused by dust mites on the Teddy Bear, not

3

> the Teddy Bear itself.  Is this enough for you to feel comfortable participating in this advertising campaign?  If so, I would be happy to send you the storyboard if the client approves this concept.

Jessup evidently felt comfortable with the campaign as described by Sullivan-Brady, for later that afternoon he wrote:

> So we are talking about dust mites on your favorite toy – I like that.
>
> I am happy for you to include The Great British Robin Hood Bear©™ in your concept.
>
> If your client approves the concept we can agree terms and issue a release agreement.

Sullivan-Brady responded the same day, just minutes after receiving Jessup's message:

> This is GREAT news!  I just need to clarify about whether there will be any costs associated with using the Teddy Bear.  If so, we need to know this up front to factor this into the decision about which concept to use.  Please let me know as soon as possible, even if it's only a ballpark figure.

Rather than naming a figure, Jessup responded the next morning with an interesting counterproposal (italics in original):

> *I have asked our finance department to look at "associated costs" and will get back to you with a proposal ASAP.*
>
> Our brand is well established in the UK , we are the first choice of The Historic Royal Palaces, British Government and Armed Services - with a big British year ahead of us one of our key goals is to locate a distributer in the USA. Bear collectors across America love our Great British Bears and with the right distributer we hope to reach a wider audience and in the future introduce some iconic American Bears.
>
> Disney found us in the early days and we are resident in their Great Britain Store at Epcot, even The Liberty Island Gift shop sell our bears! But we could use some help from a friend like Vidal Partnership.

> Maybe we could help you with the loan of Robin Hood and you could reach out to some of your friends and introduce The Great British Teddy Bear Co.
>
> I guess launching our brand with a US distributer would be easier after 194m people have seen one of our bears?
>
> Let me know your thoughts.

Later that day, Sullivan-Brady responded:

> Yes, I think that launching the brand with a US distributor would be much easier after 194 million people have seen the bear. This could certainly be beneficial to both parties. Please get back to me ASAP with the "associated costs" proposal from your finance department.

Jessup quickly responded to further clarify the nature of his suggestion (bold in original):

> Regarding "associated costs" let me clarify my suggestion:
>
> I agree that launching the brand with a US distributor would be much easier after 194 million people have seen the bear so my suggestion is that we waive any "associated costs" and in return The Vidal Partnership reach out to some of their friends and introduce The Great British Teddy Bear Co.
>
> **So to be really clear:**
>
> I will send you some free bears.
>
> You can present your concept using our brand with my permission.
>
> If the concept is approved and our bear is used in the advert - Vidal will introduce us to a US Distributer.

Sullivan-Brady wrote back six minutes later, purporting to accept this proposal:

> Thanks so much for the clarification; I'm glad we're "on the same page" with this. We would be delighted to do whatever we could to talk you up and help introduce you to a distributor in the US. I'll let you know as soon as we hear which concepts the client has decided to go with.

5

The next email between the parties came from Sullivan-Brady on February 2:

> I also wanted to let you know that the concept with the bear was approved. Attached is the board, which will show you almost frame by frame the ad as it will appear online. FYI, the bear in the boards is for-position-only. We'll replace that one with a photo of the bear as he actually appears-in the correct colored clothing, etc. As soon as it goes online, I'll let you know so you can find it.

The referenced storyboard was attached to the original message and provided to the court. It is made up of five frames. Each frame consists of a white box bounded on the bottom with a green-and-red banner featuring, in the first four frames, the Zyrtec logo. The first frame displays a question in Spanish, which asks, translated into English, "Itchy eyes?" In the second frame, six arrows pierce the white area and the text. In the third frame, a section of the white area rips away to partially reveal plaintiff's bear. In the fourth, the entire bear, holding an arrow without a suction cup at the end, appears next to the following text, as translated from the Spanish: "It may be the dust mites on your favorite teddy bear." In the final frame, a message encouraging the viewer to use Zyrtec appears next to the bear.

On February 6, 2012, Jessup wrote to remind Sullivan-Brady about their licensing arrangement, since it had become clear that its bear would be used in the Zyrtec campaign:

> Congratulations!
>
> So to refresh your memory:
>
> **So to be really clear:**
>
> I will send you some free bears
>
> You can present your concept using our brand with my permission

>If the concept is approved and our bear is used in the advert - Vidal will introduce us to a US Distributer
>
>Let me know which friendly distributer you will be introducing us to.

At this point, the relationship between the parties began to turn. Later that afternoon, Sullivan-Brady replied:

>Hope you had a good weekend. I'm still doing research on distributors because, as I said in previous emails, we're happy to talk you up and rave about the bear but we're an ad agency, so we don't really deal with the distribution end of business at all. However, I'm doing my best to find someone to put you in contact with.
>
>I'll let you know as soon as I have any info.

Silence reigned for a month, until Jessup tersely inquired about the status of the advertisement on March 5:

>Any chance of an update?
>
>Has the ad aired?
>
>Did you locate a distributer for us?

On March 14, Sullivan-Brady responded to update Jessup about her efforts to locate a distributor:

>Through my research online I found someone that I think would be a possible distributor, but since I have nothing to do with this world normally, I'm not sure of next steps. Their name is Entertainment Earth (www.eedistribution.com) and they seem to deal with a lot of different items. Especially interesting to me was the fact that they deal with items with licensing issues.
>
>Please let me know if this helps.

Later that day, Jessup wrote to convey his disappointment with this development:

>I hoped that you would have a client that may be connected with a soft toy distributed.

7

>We can look online- its an introduction we are looking for
>
>The licensed toy market is not applicable to us.
>
>I am afraid this is not what we expected - to be honest I don't feel very comfortable with the way his is working out.
>
>I will pass this back to our legal dept.

Sullivan-Brady did not respond to this email for a few days, so Jessup wrote again on March 18:

>I didn't receive a reply to my last email.
>
>Our agreement was simple and clear.
>
>In light of you not fulfilling your side of the bargain I have no option but to withdraw my permission for our intellectual property to be used by your agency in any advertisement.
>
>We have informed our legal representatives in the US of our decision and have alerted our web team to ensure any advert released by your agency does not feature the Great British Robin Hood

The next day Sullivan-Brady replied in an attempt to repair their working relationship:

>I'm sorry that it took a few days for me to reply to your last email.  Partly it was because I was in shock.
>
>In our original email trail, I specified to you that we are an advertising agency and we do not have any clients in the toy business.  That said, I have been making a good faith effort to find a distributor for you, in the spirit of our agreement, however there have been some hiccups and delays due to the fact that this is not my normal area of expertise and I am starting from scratch.
>
>I have reached out to all of my contacts about this and asked for help from everyone at the agency.  I have a few promising leads, but it has taken some time because they are not direct contacts and a few of the parties are travelling.  I'm honestly not sure how to make this happen any faster, but I am trying to do my best.

This message pacified Jessup for a few weeks, until April 17, when he wrote Sullivan-Brady to say:

> We have been patient - I will require confirmation by return that you have not used our product in your advertisement or preferably that you have honoured our agreement and you now have a distributer ready to meet us.

The same day, Sullivan-Brady wrote back to express her frustration with Jessup's impatience (bold in original):

> As I have said before, since this is not my field **at all,** it has taken me some time to find people who can get me answers. I have spoken to people at various levels and companies in the toy industry to get information and have finally managed to get referred to the president of Gund plush toys. Unfortunately, I found out today that they are unwilling to distribute items made outside of the US. I am also getting in touch with the people who order specialty toys for Hallmark gift stores here in America and I am working on getting in touch with the people who order for Toys R Us, a large US Toy chain.
>
> However, in light of the urgency indicated by your frequent emails and the tone of them, I am not sure that I will be able to fulfill your hopes for meeting any of these distributors within the time frame that you apparently have in mind, in spite of my best efforts. When we made this agreement, you never indicated that you required this to be immediate. Had you done so, I would have done even more than I already did to manage your expectations. I am a Business Manager at an Advertising Agency and my normal 12-16 hour days working on **advertising matters** don't afford much time to do as much legwork in the toy industry as you apparently expected to be done. I regret that the timeframe that you had in mind was not clearer when we made our agreement, however I did say to you several times that this is not my field and that neither I nor the agency have any contacts in this field.
>
> That said, yes, we did use the bear in our advertising, as I told you. At this point we should come to a clear agreement as to how best to move forward. I am willing to continue working to get you an introduction you to a distributor. However, you have to realize that this may take some time to accomplish. I suspect that you already know this is a difficult task.
>
> Please let me know how you would like to proceed and let us come to a final resolution as quickly as possible.

9

On April 25, Jessup wrote again to request certain details about the advertisement that had begun to run:

> Please confirm the date the advertisement featuring our bear aired by return and provide a link to the advertisement so that I can see it.

Later that day, Sullivan-Brady wrote to provide the advertisement and expand upon her prior email:

> Attached is a copy of the ad, as requested. This ad began running on 3/12 in rotation with other ads in the same campaign.
>
> In addition, I am providing some other information for your files:
>
> As mentioned in my previous email, I managed to get in contact with the an executive at Gund (one of the largest manufacturers/distributers of plush toys in the world) who was not interested in distributing British-made plush toys in the US and was unable to give me any information on someone who could do distribution of your line.
>
> I have been in contact with the buyers for the chain of toy stores Toys R Us and am waiting for a call back from them-hopefully by the end of this week. Unfortunately, it is often the case that you have to wait to get a reply from people.
>
> I have contacted someone that I know to enquire about the possibility of getting your line of products placed in the UN gift shop but, again, I am waiting to hear a response from them.
>
> I have contacted several specialty manufacturers and distributors who have told me that they are unable to help with my request.
>
> I have reached out to just about everyone that I can think of in my personal and professional network to see if they know of anyone in the toy industry. The most common response is that they don't have any contacts, but I continue to try.
>
> In short, I have been making a good faith effort to help you find a distributor in the US and I will continue to do the best that I can.

The final version of the referenced advertisement was attached to Sullivan-Brady's

email and provided to the court. It differs from the earlier storyboard in certain minor respects. First, the advertisement contains four frames instead of five, omitting the storyboard frame where the white background rips away. Second, the bear in the final advertisement features different dress and accessories than the bear in the storyboard. Most notably, the bear in the advertisement holds several arrows in a quiver rather than one unsheathed arrow. In all other respects, the storyboard and the advertisement are identical.

The next day, Jessup sent Sullivan-Brady one last email to determine whether the advertisement featured audio commentary. Sullivan-Brady confirmed that it did not. Plaintiff then sent defendants a cease-and-desist letter on May 1, 2012, and the advertisement was pulled from circulation the next day.[2]

Based on these allegations, plaintiff asserts three causes of action in its amended complaint. First, plaintiff alleges a single cause of action for "Copyright Infringement and Unfair Competition." Plaintiff next alleges a cause of action for false advertising and unfair competition under Section 43 of the Lanham Act, 15 U.S.C. §1125(a). Third, plaintiff alleges that defendants' conduct violated New York state consumer protection law, specifically N.Y. Gen Bus. L. §§ 349 and 350.

The complaint also contains the following factual allegations concerning damages:

> 23. By reason of the foregoing, Plaintiff suffered damages which at presently cannot be accurately determined, but which Plaintiff believes are not less than $500,000, including Defendants' profits. Amongst other things:
>
> a) In the absence of permission from Plaintiff, Defendants would have paid Plaintiff for use of the Bear;

---

[2] The amended complaint states that the advertisement (Cplt. ¶ 20) "continued to run at least until 5/2/12, and perhaps later," but plaintiff does not contest defendants' assertion that the advertisement ceased to run on May 2.

11

      b) On information and belief, prospective purchasers refrained from purchasing the Bear after seeing the ads.

24. In addition, Plaintiff is entitled to recover from Defendants the profits, gains and advantages enjoyed by Defendants from their conduct.

The complaint concludes with a table itemizing the damages sought on each cause of action. Under the heading of "Copyright Infringement Damages," plaintiff seeks $500,000 in compensatory damages and injunctive relief, including an accounting of Defendants' profits. Under the heading of "False Advertising Lanham Act," plaintiff seeks the same. Under the heading of "False Advertising NY," plaintiff seeks treble damages of $1.5 million and $5 million in punitive damages. Finally, under the heading "All," plaintiff seeks attorneys' fees.

## The Present Motion

Defendants now move to dismiss the complaint on several grounds. They contend that the claim for copyright infringement must be dismissed because the parties reached a licensing agreement regarding the use of the bear, so any dispute arising from the parties' arrangement sounds in breach of contract, not copyright infringement. They further argue that the Lanham Act claim must be dismissed because the email chain relied upon in the complaint demonstrates that plaintiff acquiesced to the bear's portrayal in the advertisement. Defendants then argue that the third cause of action under state law must be dismissed because the complaint does not allege the type of injury to the consumer public at large that those laws are designed to protect. Finally, defendants argue that all the claims must be dismissed because the complaint does not contain sufficient factual allegations

regarding damages.

## Discussion

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must plead sufficient facts to state a claim to relief that is plausible on its face. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); Ashcroft v. Iqbal, 556 U.S. 662, 679-680 (2009). In deciding such a motion, a court must accept as true the facts alleged in the complaint, but it should not assume the truth of legal conclusions. Iqbal, 556 U.S. at 679. A court must also draw all reasonable inferences in the plaintiff's favor, and it may consider documents attached to the complaint, incorporated by reference into the complaint, or known to and relied on by the plaintiff in bringing the suit. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

A "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. But "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," dismissal is appropriate. Id. at 679. Moreover, to comply with Iqbal, a complaint asserting a claim for damages must allege "particular facts as to how [plaintiff] was damaged...." IBM v. Dale, No 11 Civ. 951, 2011 U.S. Dist. LEXIS 102187, at *5 (S.D.N.Y. Sept. 9, 2011).

The First Cause of Action: Copyright Infringement

It is clear from the undisputed emails that there is absolutely no merit to the claim of copyright infringement.

Defendant sought to use plaintiff's bear in an advertisement. The emails show in detail how such use was conceived of and worked out in stages. Plaintiff <u>gave permission</u> to defendant to develop the advertisement, using plaintiff's bear. In response to defendant's request to know how much plaintiff would charge, plaintiff asked defendant to try to find a U.S. distributor for plaintiff's bears. This clearly became, in plaintiff's mind, the most important part of the relationship between the two parties. But plaintiff's permission to develop the advertisement continued. And indeed the advertisement, using plaintiff's bear, was finished and released along with the rest of defendant's advertising campaign pursuant to the permission granted by plaintiff.

The relationship between the parties lasted from mid-January 2012 until May 1, 2012. Defendant provided plaintiff with storyboards of the advertisements, and then a set of changed storyboards. A few days after receiving the first storyboard plaintiff sent an email offering "congratulations!"

However, as the days passed, defendant did not find a U.S. distributor for plaintiff.

On March 18, plaintiff emailed defendant purporting to "withdraw my permission" for the advertisement. But the parties then continued to exchange emails dealing with the unsuccessful attempts by the defendant to obtain the distributor, and those emails make clear that, in both parties' minds, defendant still had permission to use plaintiff's bears. It was not until May 1, 2012 that plaintiff sent defendant a cease-and-desist letter, and the advertisement was pulled the next day.

14

What all this confirms is that defendant had permission to use plaintiff's bear in the advertisement until the problem about the distributor led plaintiff to withdraw that permission, at which time defendant immediately stopped the advertisement.

There was no copyright infringement.

The Second Cause of Action: Lanham Act False Advertising

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) imposes liability for the use of a "false description of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same. . . ." Two different theories of recovery are available in Lanham Act false advertising actions: "(1) an advertisement may be false on its face; or (2) the advertisement may be literally true, but given the merchandising context, it nevertheless is likely to mislead and confuse consumers." Johnson & Johnson v. GAC International, Inc., 862 F.2d 975, 977 (2d Cir. 1988). To succeed on the latter theory, a plaintiff must introduce extrinsic evidence of confusion among the buying public. See Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 153 (2d Cir. N.Y. 2007).

Plaintiff alleges (Cplt. ¶ 17) that the Zyrtec advertisement "leaves, or would tend to leave, the false impression that: a) the Bear may cause allergies—either because of its materials or because it attracts dust mites; b) the arrow carried by the Bear might cause injury." It is unclear from this formulation whether plaintiff intends to proceed on a theory of literal falsity or a theory that the advertisement is literally true but misleading. The language the complaint employs lends itself to both theories.

15

But no matter the theory, the second cause of action must be dismissed, because plaintiff acquiesced to the portrayal of the bear in the advertisement. "Acquiescence is an equitable defense whereby relief may be denied a trademark owner who has, by word or deed, expressed consent to the defendant's use of its mark." Jim Henson Prods. v. John T. Brady & Assocs., 867 F. Supp. 175, 187 (S.D.N.Y. 1994). Acquiescence "constitutes a ground for denial of relief only upon a finding of conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that the plaintiff would not assert his trademark rights against the defendant." Carl Zeiss Stiftung v. Veb Carl Zeiss Jena, 433 F.2d 686, 704 (2d Cir. 1970).

While an affirmative defense like acquiescence is generally pleaded in a defendant's answer and is not normally a proper subject for a pre-answer motion to dismiss, see Fed. R. Civ. P. 8(c), an "affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint." Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 74 (2d. Cir. 1998). An affirmative defense may also be raised on a pre-answer motion where materials properly before the court establish its existence beyond question. See Day v. Moscow, 955 F.2d 807, 811 (2d Cir. 1992).

Here, the email correspondence between Sullivan-Brady and Jessup—which, as the court noted above, was relied upon by the plaintiff is bringing this action and is properly before the court on the present motion—demonstrates that plaintiff acquiesced to the depiction of the bear in the Zyrtec advertisement. Jessup explicitly approved the general concept of the advertisement in his email of January 24, when, after Sullivan-Brady had

16

explained it to him, he stated: "So we are talking about dust mites on your favorite toy – I like that." Then, on February 2, Jessup was provided the full storyboard for the advertisement, and he never objected to bear's depiction therein. Rather than protest the storyboard, on February 6, 2012, Jessup congratulated Sullivan-Brady for the fact that McNeil had approved the campaign. Finally, that storyboard did not differ from the final advertisement in any way that is relevant to plaintiff's false advertising claim. The storyboard showed arrows piercing the frame, and it contained the line about dust mites on the bear. From this record, it is clear beyond question that Jessup approved of the allegedly false advertisement and acquiesced to its publication.

Thus plaintiff's second cause of action is dismissed.

The Third Cause of Action: N.Y. General Business Law §§ 349 and 350

N.Y. Gen. Bus. Law § 349 forbids "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 350 forbids "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

Despite their broad language, Sections 349 and 350 are consumer protection laws. See Teller v. Bill Hayes, Ltd., 630 N.Y.S.2d 769, 772 (N.Y. App. Div. 2d Dep't 1995). Thus, plaintiff must, "at the threshold, charge conduct that is consumer oriented. The conduct need not be repetitive or recurring but defendant's acts or practices must have a broad impact on consumers at large." New York Univ. v. Cont'l Ins. Co., 639 N.Y.S.2d 283, 290 (N.Y. 1995). When identifying the sort of conduct that these laws forbid "New

17

York courts have in large measure relied on the Federal Trade Commission Act's definition of such practices." Genesco Entertainment, a Div. of Lymutt Industries, Inc. v. Koch, 593 F.Supp. 743, 751 -752 (S.D.N.Y. 1984). And for a given practice or advertisement to warrant FTC intervention, "mere misrepresentation and confusion on the part of purchasers or even that they have been deceived is not enough. The public interest must be specific and substantial." FTC v. Royal Milling Co., 288 U.S. 212, 216 (U.S. 1933).

In this action, plaintiff has not alleged anything approaching a specific and substantial injury to the public at large. The complaint alleges that defendants' advertisement misled consumers about certain features of plaintiff's bear. Perhaps it is true that some people, after glancing at defendants' advertisement, wrongly inferred that plaintiff's bear carries lethal weapons and is made of hyper-allergenic materials. This wrongful belief would, at worst, deprive a child or teddy-bear aficionado of a lovely toy. It would have no further impact on the buying public. That is to say, the real injury here is not be borne by public; it is borne by plaintiff, in the form of reduced sales.

Thus, the third cause of action is dismissed, because plaintiff has not alleged that defendants' conduct impacted the consumer public in a manner contemplated by N.Y. Gen. Bus. Law §§ 349 and 350.

## Conclusion

Defendants' motion to dismiss is granted.

This opinion resolves the motions listed as documents no. 8 and 12 on the docket of the case 12 Civ. 3926.

So ordered.

Dated: New York, New York
March 29, 2013

_____
Thomas P. Griesa
United States District Judge

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 29, 2013
```